EXHIBIT A

**FAIRWINDS ESTATE WINERY, LLC**

**OPERATING AGREEMENT**

**Dated:  March 31, 2015**

# FAIRWINDS ESTATE WINERY, LLC

## OPERATING AGREEMENT

This Operating Agreement is made and entered into as of the 31st day of March, 2015 (the "Effective Date"), by and between FAIRWINDS ESTATE, LLC, a Nevada limited liability company (hereinafter referred to as "FE") and IMC INVESTMENT GROUP FE WINERY, LLC, a Nevada limited liability company ("IMC"). FE and IMC and their respective permitted assignees are herein sometimes referred to individually as a "Member" and collectively as the "Members". All references to FE and IMC will also include their successors and assigns pursuant to Article XIII.

## BACKGROUND FACTS:

A.     On February 12, 2015, the members of FE formed a limited liability company by filing certain Articles of Organization with the Secretary of State of the State of Nevada pursuant to the limited liability company laws of the State of Nevada.

B.     The Members desire to enter into this Agreement.

C.     Each Member represents that it has sufficient right and authority, without violating or breaching any provisions of law or contract, to execute this Agreement and is not acting on behalf of any undisclosed or partially disclosed principal by such action.

NOW, THEREFORE, in consideration of agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement and the attached Exhibits, the following capitalized terms have the meanings stated below and include the plural as well as the singular number.

1.1     "**Accountants**" means the independent certified public accountants selected by the Manager.

1.2     "**Act**" means the limited liability company law of the State of Nevada, and all amendments to the Act.

1.3     "**Act of Insolvency**" will be deemed to have occurred if (a) a Member files in any court, in accordance with any statute of the United States or of any state, a petition in bankruptcy or insolvency, or files for the appointment of a receiver or trustee of all or a portion of the Member's property, or makes an assignment for the benefit of creditors or admits in writing its/his/her inability to pay its/his/her debts generally as they become due; or (b) there is filed against a Member in any court in accordance with any statute of the United States or of any state, a petition in bankruptcy or insolvency, or for reorganization, or for appointment of a receiver or a

trustee of all or a portion of the Member's property, and any order or decree is not vacated, or such appointment is not revoked or terminated and such receiver or trustee discharged, within ninety (90) days after entry or appointment, as the case may be.

 1.4 "**Additional Capital Contribution**" means, with respect to the Members, the amounts contributed to the Company by such Members as capital contributions pursuant to Section 4.3.

 1.5 "**Additional Contribution Account**" shall mean a record keeping account to be maintained by the Company for each Member, the initial balance of which shall equal zero. The balance of each Member's Additional Contribution Account shall be increased by the Additional Capital Contributions of that Member to the Company. The balance of each Member's Additional Contribution Account shall be reduced by distributions to that Member pursuant to Section 6.2.1.

 1.6 "**Additional Member**" is defined in Section 12.1 and means any person or entity who acquires Additional Units of the Company.

 1.7 "**Adjusted Capital Account**" means, with respect to any Member as of the end of any fiscal year, such Member's Capital Account reduced by those anticipated allocations, adjustments and distributions described in Section 1.704-1(b)(2)(ii)(d)(4)-(6) of the Treasury Regulations and increased by an amount that such Member would be obligated to restore pursuant to this Agreement or would be deemed obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations.

 1.8 "**Affiliate**" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Person, (iii) any officer, director or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities of any Person described in clauses (i) through (iii) of this sentence.

 1.9 "**Agreement**" means this Operating Agreement as originally executed and as subsequently amended or supplemented in accordance with the terms herein.

 1.10 "**Allocation Regulations**" means Section 1.704-1 and 1.704-2 of the Treasury Regulations as such regulations may be amended and in effect from time to time (whether Temporary or Final form) and any corresponding provisions of succeeding Treasury Regulations.

 1.11 "**Articles**" means the Articles of Organization of the Company as properly adopted and amended from time to time by the Members and filed with the Secretary of State of the State of Nevada.

 1.12 "**Budget**" means the annual operating budget for the Property and Company business prepared by the Manager and Management Company and reasonably approved by the Members. The Budget for each fiscal year shall be prepared by the Manager and submitted to the Members for approval no later than November 1 of the preceding fiscal year. In the event that the

Members fail to timely approve a Budget for any given year, the Budget for the preceding year shall remain in effect until the new Budget is approved.

1.13    **"Business Day"** means any day that the national banks in San Francisco, California, are open for business.

1.14    **"Capital Account"** means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

       1.14.1  To each Member's Capital Account there will be credited such Member's Capital Contributions and Additional Capital Contributions (if any), such Member's distributive share of Profits and the amount of Company liabilities that are assumed by such Member or that are secured by any Company Assets distributed to such Member.

       1.14.2  To each Member's Capital Account there will be debited the amount of cash and the Gross Asset Value of any Company Assets distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

       In the event any Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

       In the event the Gross Asset Values of Company Assets are adjusted pursuant to subsection 1.25.2 hereof, the Capital Accounts of all Members will be adjusted simultaneously to reflect the aggregate net adjustment as if the Company recognized gain or loss equal to the amount of such aggregate net adjustment.

       The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Allocation Regulations and will be interpreted and applied in a manner consistent with such Allocation Regulations. In the event the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with the Allocation Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 15.4 hereof upon the dissolution of the Company. The Manager will adjust the amounts debited or credited to Capital Accounts with respect to any property contributed to the Company by or distributed to a Member and any liabilities that are secured by such contributed or distributed property or that are assumed by the Company or the Member, in the event the Manager determines such adjustments are necessary or appropriate pursuant to the Allocation Regulations. The Manager also will make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Allocation Regulations.

1.15    **"Capital Contribution"** means the total amount of cash or other property contributed to the Company by a Member as capital in accordance with this Agreement; such term includes the Capital Contributions described in Sections 4.2 and 4.3.

1.16    "**Closing**" means the closing of the transfer of title to the Property from Cuvaison, Inc. ("Seller") to the Company pursuant to the Transaction Contract.

1.17    "**Closing Date**" means the day when the Company takes title to the Property.

1.18    "**Code**" means the Internal Revenue Code of 1986, as it may be amended, or any subsequent federal law concerning income tax that is enacted in substitution for, or that corresponds with, such Code.

1.19    "**Company**" means the limited liability company created pursuant to this Agreement in accordance with the Act.

1.20    "**Company Assets**" means any and all property contributed to or acquired by the Company in accordance with this Agreement, including but not limited to the Property, and both tangible and intangible property.

1.21    "**Company Minimum Gain**" has the meaning set forth in Section 1.704-2(d) of the Treasury Regulations for Partnership minimum gain.

1.22    "**Depreciation**" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

1.23    "**Fiscal Year**" or "**Year**" means a calendar year (or portion thereof) ending on December 31 of such year.

1.24    "**Governmental Authorities**" means any federal, state, county, municipal or other governmental department or entity, or any authority, commission, board, bureau, court or agency having jurisdiction over the Company Assets, or any portion thereof, and whose approval is necessary for the development of the Property.

1.25    "**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

1.25.1  The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

1.25.2  The Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing

Member in exchange for more than a "de minimis" Capital Contribution; (ii) the distribution by the Company to a Member of more than a "de minimis" amount of Company Assets other than money as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of the Allocation Regulations; provided, however, that adjustments pursuant to clauses (i) and (ii) above will be made only if the Manager reasonably determine that such adjustments are necessary and appropriate to reflect the relative economic interests of the Members in the Company; and

        1.25.3 If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection 1.25.1 or 1.25.2, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

    1.26    **"Initial Capital Contributions"** can be in the form of equity or loans/promissory notes and shall have the meaning given in Section 4.2 hereof.

    1.27    **"Interest"** shall mean a Member's entire ownership interest in the Company, including without limitation, its right to distributions of Net Cash from Operations and Net Cash from Sales or Refinancings.

    1.28    **"Manager"** means, collectively, the two Persons, who need not be Members, to whom all or part of the management duties of the Company's business is delegated as provided in Article IX. The initial Managers are Robert Radovan and Brandon Chaney.

    1.29    **"Member"** means each of the parties who has executed this Agreement and each of the parties who may hereafter become Additional or Substitute Members as provided in the Articles and in this Agreement.

    1.30    **"Member Minimum Gain"** means an amount with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt was treated as Nonrecourse Liability, determined in accordance with Section 1.704-2(g)(3) of the Treasury Regulations.

    1.31    **"Member Nonrecourse Debt"** has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations for partner nonrecourse debt.

    1.32    **"Member Nonrecourse Deductions"** has the meaning set forth in Section 1.7042(i)(2) of the Treasury Regulations for partner nonrecourse deductions. The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Fiscal Year of the Company equals the excess, if any, of the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during such Fiscal Year over the aggregate amount of any distributions during such Fiscal Year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt determined in accordance with Section 1.704-2(i)(2) of the Treasury Regulations.

1.33   **"Net Cash From Operations"** means the gross cash proceeds from the Company operations less the portion thereof used to pay or establish reserves for all Company expenses in an amount set forth in the Budget, reserves for property taxes and insurance, interest and principal payments on third party indebtedness, Lender required reserves (including interest and operating expenses), capital improvements, replacements, contingencies, working capital, and other cash requirements, all as set out in the Budget or as may otherwise be determined by the Manager. "Net Cash From Operations" will not be reduced by depreciation, amortization, cost recovery deductions or similar allowances.

1.34   **"Net Cash From Sales or Financings"** means the net cash proceeds from all sales and other dispositions (other than sales and dispositions of personal property in the ordinary course of business), and all financings of the Property after the repayment of third party indebtedness required in connection with such sale, disposition or financing, less any portion thereof used to pay established reserves for Company obligations and expenses in an amount to be determined by the Manager, but, which shall include reserves for property taxes and insurance, interest and principal payments on third party indebtedness, Lender required reserves for property taxes and insurance, interest and principal payments on third party indebtedness, Lender required reserves (including interest and operating expenses), capital improvements, replacements, contingencies, working capital, and other cash requirements, all as set out in the Budget. "Net Cash From Sales or Financings" will include all principal and interest payments with respect to any note or other obligation received by the Company in connection with sales and other dispositions (other than in the ordinary course of business) of the Property.

1.35   **"Nonrecourse Deductions"** has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations. The amount of Nonrecourse Deductions for a Fiscal Year equals the net increase, if any, in the amount of Company Minimum Gain during that Fiscal Year, determined according to the provisions of Section 1.704-2(b)(1) of the Treasury Regulations.

1.36   **"Nonrecourse Liability"** has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

1.37   **"Percentage Interest"** means, (i) with respect to IMC, 60%, (ii) with respect to FE, 40%..

1.38   **"Person"** means a natural person, corporation, trust, partnership, joint venture, association or other business or other legal entity.

1.39   **"Profits"** and **"Losses"** means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

1.39.1 any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this subsection 1.39 will be added to such taxable income or loss;

1.39.2 any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705 (a)(2)(B) expenditures pursuant to Section 1. 704- 1 (b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this subsection 1.39 will be subtracted from such taxable income or loss;

1.39.3 any gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.39.4 in lieu of the depreciation, amortization and other cost recovery deductions taken in computing such taxable income or loss, there will be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with Section 1.22; and

1.39.5 any items of income, gain, loss or deduction specifically allocated pursuant to Sections 5.2 and 5.3 will not be taken into account in determining Profits or Losses.

1.40    **"Property"** means the real property located at 4550 Silverado Trail, Napa County, California, together with any and all improvements now or hereafter constructed thereon.

1.41    **"Seller"** means Cuvaison, Inc.

1.42    **"Substitute Member"** means any transferee of a Member's Interest who is admitted as a Member in the Company pursuant to Article 13.

1.43    **"Transaction Contract"** means that certain Winery Asset Purchase Agreement dated December 16, 2014, entered into between Seller, as owner, and Criswell Radovan, LLC ("CR"), as purchaser, pertaining to the acquisition of the Property, such Transaction Contract to be assigned by CR to the Company on or prior to the Closing Date.

1.44    **"Treasury Regulations"** means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.45    **"Unreturned Capital"** means for each Member as of any date an amount equal to the excess, if any, of (a) the aggregate Capital Contributions of such Member as of such day over (b) the aggregate distributions to such Member pursuant to subsections 6.2.1 and 6.2.3.

## ARTICLE 2
## ORGANIZATION AND TERM

2.1 **Formation**. The members of FE formed the Company under and pursuant to the provisions of the Act by filing the Articles on February 12, 2015. The rights and liabilities of the Members will be as provided under the Act, the Articles and this Agreement. The fact that the Articles are on file in the office of the Secretary of State, State of Nevada, will constitute notice that the Company is a limited liability company.

In order to maintain the Company as a limited liability company under the laws of the State of Nevada, the Company will from time to time take appropriate action, including the preparation and filing of such amendments to the Articles and such other fictitious name certificates, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

2.1.1 a change in the Company name;

2.1.2 a correction of false or erroneous statements in the Articles or the desire of the Members to make a change in any statement therein in order that it will accurately represent the agreement among the Members; or

2.1.3 a change in the time for dissolution of the Company as stated in the Articles and in this Agreement.

2.2 **Name**. The business and affairs of the Company will be conducted solely under the name of "Fairwinds Estate Winery, LLC". The Company will execute and file all assumed or fictitious name certificates required to be filed in the applicable public records of the county in which the Property is located or in any other county in which the Company is doing business.

2.3 **Term**. The term of the Company commenced on February 12, 2015, and will continue in full force and effect until the earliest of the following:

2.3.1 December 31, 2065;

2.3.2 dissolution of the Company by the unanimous written agreement of the Members;

2.3.3 the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company as provided in Article 3, unless at least two remaining Members unanimously agree within ninety (90) days after such event that the business of the Company be continued rather than the Company be dissolved and liquidated; or

2.3.4 entry of a decree of judicial dissolution.

2.4 **Registered Agent and Office**. The Company's registered agent and office in Nevada will be Capitol Corporate Services, Inc., 202 S. Minnesota Street, Carson City, Nevada 89703. At any time, the Company may designate another registered agent and/or office.

2.5     **Principal Place of Business**. The principal place of business of the Company will be 1336-D Oak Street, St. Helena, California 94574 and 880 Northwood Blvd, Ste.2, Incline Village, NV 89451. At any time, the Company may establish additional offices. The following items will at all times be maintained at the Company's principal office:

2.5.1    a current list of the full name and last known business, residence or mailing address of each Member and each Manager, both past and present;

2.5.2    a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

2.5.3    copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;

2.5.4    copies of this Agreement with all amendments and copies of any writings permitted or required under the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

2.5.5    minutes of every annual and special meeting and any meeting ordered pursuant to Section 10.4;

2.5.6    unless contained in this Agreement, a statement prepared and certified as accurate by the Manager of the Company which describes:

(a)      the amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

(b)      the times at which or events on the happening of which any additional contributions agreed to be made by each Member are to be made;

(c)      if agreed upon, the time at which or the events on the happening of which a Member may terminate his membership in the Company and the amount of, or the method of determining, the distribution to which he may be entitled respecting his membership interests and the terms and conditions of the termination and distribution;

(d)      any right of a Member to receive distributions which include a return of all or any part of a Member's contribution;

2.5.7    any written consents obtained from Members pursuant to the Act regarding action taken by Members without a meeting.

Such records are subject to inspection and copying at the reasonable request and at the expense of any Member during ordinary business hours.

2.6 **Other Instruments**. Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Company deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement.

**ARTICLE 3**
**PURPOSES AND POWERS OF THE COMPANY**

3.1 **Purposes**. The overall business, purpose and scope of the Company is to acquire, own, develop, finance, mortgage, maintain, operate, manage, rent, market and sell on the Property and other future locations, a winery, including without limitation, managing a tasting room, producing wine, managing the custom crush wine operations, holding public and private events on the Property, a fine foods grocery, and any other operations consistent therewith. The overall business, purpose and scope as described above will be the only business or purpose of the Company. After its acquisition of the Property, the Company will hold, develop, construct, own, mortgage, manage, maintain, lease, rent, sell and otherwise use all or any portion of the Property for the production of income and profit.

3.2 **Authority of Company**. In furtherance of its purpose, but consistent with and subject to the provisions of this Agreement and all applicable laws, the Company is empowered and authorized to do any and all acts and things incidental to, or necessary, appropriate, proper, advisable, or convenient for, the furtherance and accomplishment of the purposes described in Section 3.1 and for the protection and benefit of the Company, including, without limitation:

3.2.1 acquiring fee and leasehold estates in real and personal property and the rights therein or appurtenant thereto, necessary, appropriate or incidental to the ownership, management and maintenance of the Property, including real property adjacent to the Property;

3.2.2 entering into, performing and carrying out contracts and agreements of any kind, and entering into any kind of activity, in connection with, or incidental to, the accomplishment of the purposes of the Company;

3.2.3 securing approvals, permits and consents necessary, appropriate or incidental to the accomplishment of the purposes of the Company;

3.2.4 developing and constructing improvements to the Property and dedicating or otherwise conveying portions of the Company Assets as may further the purposes of the Company;

3.2.5 borrowing money and issuing evidences of indebtedness in furtherance of the Company business and securing any Company indebtedness by mortgage, pledge, security interest or other lien, and otherwise financing or refinancing (defined for purposes of this Agreement to include recast, modified, extended or increased) the Property;

3.2.6 leasing, mortgaging, selling or otherwise disposing of all or any part of the Property for cash, stock, other securities or other property, or any combination thereof;

-10-

3.2.7   entering into partnerships, ventures and other business arrangements, and contributing all or any portion of the Company Assets as consideration for same;

3.2.8   to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

3.2.9   to appoint agents of the Company, and define their duties and fix their compensation, if any;

3.2.10  to indemnify a Member or Manager or former Member or Manager, and to make any other indemnification that is authorized by the Articles or by this Agreement in accordance with the Act;

3.2.11  at the end of the term hereof as provided in Section 2.3, to cease its activities and surrender its certificate of organization;

3.2.12  to have and exercise all powers necessary or convenient to effect any or all of the purposes for which the Company is organized;

3.2.13  to become a member of a general partnership, limited partnership, joint venture or similar association or any other limited liability company; and

3.2.14  doing and performing all other acts and things which may be necessary, appropriate or incidental to the carrying out of the business and purposes of the Company.

3.3   **Certain Transactions**.  The Company is expressly permitted in the normal course of its business to enter into transactions with any or all Members or with any Affiliate of any or all Members provided that the price and other terms of such transactions are approved by IMC.

3.4   **Adjacent Property**.  No Member and no Affiliate of any Member may acquire real property adjacent to the Property unless the Company has been offered the opportunity to acquire such Property and elected in writing not to do so.

## ARTICLE 4
## MEMBERS, DUTIES, CAPITAL CONTRIBUTIONS AND LOANS

4.1   **Members; Obligation to Update**.  All Members of the Company, past and present, and their last known business, residence or mailing address will be listed on the attached Schedule 4.1. The Manager will be required to update Schedule 4.1 from time to time as necessary to accurately reflect the information therein.

4.2   **Initial Capital Contributions**.  The Initial Capital Contributions that shall be required of the Members, and the timing thereof, are set forth on the attached Schedule 4.2.

4.3   **Additional Capital Contributions**. At such time or times as the Manager reasonably determines that capital contributions in addition to the Initial Capital Contributions are necessary or desirable in order to fulfill the contemplated objectives of the Company, the

Manager shall notify the Members, which notice shall set forth the aggregate amount of the requested contributions. Each such contribution shall be referred to as an "Additional Capital Contribution." If the Members elect not to contribute all of the Additional Capital Contributions needed by the Company, the Members shall jointly attempt to raise the remainder through additional equity investors or lenders.

4.4    **Liability of Member**. Upon the payment by a Member of the capital contributions required of it hereunder, such Member will have no further liability or responsibility to the Company or any creditor except to the extent specifically set forth herein.

4.5    **Duties and Obligations of the Members with Respect to Equity and Loans**. The following will be the general rights, duties and obligations applicable to the Members with respect to equity and loans for the Company:

4.5.1    FE and IMC will use its diligent efforts to obtain all required additional third party equity capital and loans.

4.5.2    Any and all documents relating to any loan to be executed by the Company will be subject to the prior approval of FE and IMC..

4.6    **Withdrawals and Interest**. No Member will have the right to:

4.6.1    withdraw its Capital Contribution;

4.6.2    receive any return or interest on any portion of its Capital Contribution except as otherwise provided herein; or

4.6.3    withdraw from the Company except by transfer of its Units to another party in accordance with Article 14, by resignation in accordance with Section 8.7, or upon the dissolution of the Company.

4.7    **Return**. No Member will be entitled to the return of all or any part of its Capital Contribution unless and until there remains Company Assets after:

4.7.1    all liabilities of the Company (except liabilities to Members on account of their Capital Contributions) have been paid;

4.7.2    all amounts due to Members in respect of their share of profits and other gains have been paid; and

4.7.3    the Company has been dissolved without reformation in accordance with Article 14 and Articles of Dissolution have been filed with the Nevada Secretary of State.

**ARTICLE 5**
**ALLOCATIONS OF PROFITS AND LOSSES**

5.1    **Profits and Losses**. Profits and Losses for any Fiscal Year will be allocated among the Members so that the Capital Account of each Member, increased by his/its share of

Company Minimum Gain and his/its share of Member Minimum Gain is, as nearly as possible, positive in an amount equal to the cash that the Company would distribute to such Member, or negative in an amount equal to the cash that such Member would contribute to the Company, as the case may be, if (i) the Company liquidated by selling all of its assets for their respective Gross Asset Values, (ii) the proceeds of such sales, and any other cash of the Company, were used to satisfy the Company's debts in accordance with, and to the extent required by, their terms and in the order of priority prescribed by the applicable laws governing creditors' rights, and (iii) either (A) the Company distributed any remaining cash to the Members pursuant to Section 6.2 hereof or (B) the Members contributed to the Company cash in the amount of any remaining Recourse Liabilities of the Company; provided, however, that no Losses will be allocated to any Member for any Fiscal Year to the extent that such Losses would create or increase a deficit in such Member's Adjusted Capital Account.

5.2    **Special Gross Allocation**. If, after giving effect to the allocations set forth in Section 5.3 hereof, an allocation of Profits or Losses pursuant to Section 5.1 (determined as though no items were allocable pursuant to this Section 5.2) for any Fiscal Year would leave the Capital Account(s), increased by the share(s) of Company Minimum Gain and share(s) of Member Minimum Gain, of any Member(s) short of (less than) the aggregate amount that would be distributed to such Member(s) under the hypothetical circumstances described in Section 5.1 while leaving the Capital Account(s), increased by the share(s) of Company Minimum Gain and share(s) of Member Minimum Gain, of any other Member(s) above (more than) the aggregate amount that would be distributed to such other Member(s) under such circumstances, then items of income or gain will be allocated to the former Member(s), and items of loss or expense will be allocated to the latter Member(s), until either (i) Profits or Losses (determined pursuant to Section 1.40, without regard to the items of income, gain, expense or loss allocated pursuant to this Section 5.2) can be allocated so as to cause each Member's Capital Account, increased by such Member's share of Company Minimum Gain and share of Member Minimum Gain to equal the amount that would be distributed to such Member under the hypothetical circumstances described in Section 5.1 or (ii) there are no more items to allocate.

5.3    **Special Allocations**. The following special allocations will be made in the following order:

5.3.1    Items of gross income and gain will be allocated to each Member in an amount and manner sufficient to eliminate, as quickly as possible, any deficit in such Member's Adjusted Capital Account to the extent that such deficit is created or increased by any unexpected adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4)-(6) of the Treasury Regulations. This subsection 5.3.1 and the proviso of Section 5.1 are intended to comply with the "alternative test for economic effect" provisions of Section 1. 704-1 (b)(2)(ii)(d) of the Treasury Regulations and will be interpreted consistently therewith;

5.3.2    If, for a Fiscal Year, there is a net decrease in Member Minimum Gain, then each Member will be allocated items of gross income or gain equal to such Member's share of such net decrease, determined under Section 1.704-2(i) of the Treasury Regulations. However, in accordance with Section 1.704-2(i)(4) of the Treasury Regulations, the preceding sentence will not apply to the extent that the net decrease in Member Minimum Gain results from (i) a capital contribution from such Member which is used to repay a liability of the Company or (ii) a refinancing or lapse of a guarantee of, or any other change in. a liability of the Company that

-13-

causes such liability to become partially or wholly a Nonrecourse Liability. This subsection 5.3.2 is intended to comply with the minimum gain chargeback requirement of Section 1.704-2(i)(4) of the Treasury Regulations and will be interpreted consistently therewith;

5.3.3    If, for a Fiscal Year, there is a net decrease in Company Minimum Gain, then each Member will be allocated items of income and gain equal to such Member's share of such net decrease, determined in accordance with Sections 1.704-2(f) and 1.704-2(g) of the Treasury Regulations. However, in accordance with Section 1.704-2(f)(2) of the Treasury Regulations, the preceding sentence will not apply to the extent that the net decrease in Company Minimum Gain results from (i) a Capital Contribution from such Member which is used to pay a liability of the Company or (ii) a refinancing or guarantee of, or any other change in, a liability of the Company that causes such liability to become partially or wholly a Member Nonrecourse Liability for which such Members bears the economic risk of loss. This subsection 5.3.3 is intended to comply with the minimum gain chargeback requirement of Section 1.704-2(f) of the Treasury Regulations and will be interpreted consistently therewith;

5.3.4    Nonrecourse Deductions for any Fiscal Year will be allocated among the Members pro rata, in accordance with their Percentage Interests;

5.3.5    Member Nonrecourse Deductions for any Fiscal Year will be allocated to the Members who bear the economic risk of loss with respect to the Member Nonrecourse Liability to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations;

5.3.6    The proviso at the end of Section 5.1, and the allocations set forth in this Section 5.3, other than subsection 5.3.7 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Article 5. Therefore, notwithstanding any other provision of this Article 5 (other than the Regulatory Allocations), the Manager will make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance, to the extent possible, is equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 5.1 (other than the proviso at the end thereof), 5.2, and subsection 5.3.7. In exercising his discretion under this subsection 5.3.6, the Manager will take into account future Regulatory Allocations under subsections 5.3.2 and 5.3.3 that, although not yet made, are likely to offset other Regulatory Allocations previously made under subsections 5.3.4 and 5.3.5;

5.3.7    It is intended that the amount to be distributed to a Member pursuant to subsection 15.4.3 of this Agreement will equal the amount such Member would receive if liquidation proceeds were instead distributed in accordance with Section 6.2 of this Agreement. This intended distribution amount for a Member is referred to as such Member's "Targeted Distribution Amount". Notwithstanding any preceding provision to the contrary in this Article 5, if upon a termination and liquidation of the Company, any Member's Capital Account balance immediately prior to the distributions to be made pursuant to subsection 14.4.3 of this Agreement (determined tentatively after allocations made for such Fiscal Year under this Article V without

regard to this subsection 5.3.7) would be less than such Member's "Targeted Distribution Amount", then, for the current Fiscal Year and, if necessary and to the extent amended tax returns can be filed, for prior Fiscal Years of the Company, such Member will be specially allocated items of income or gain for such years, and items of loss or deduction for such years will be allocated away from such Member to the other Members, until Profits or Losses for the year(s) of termination and liquidation of the Company can be allocated so as to cause each Member's actual Capital Account balance to equal the Targeted Distribution Amount for such Member (and such Profits or Losses will be so allocated pursuant to Sections 5.1 and 5.2). In the event that liquidation distributions are to be made over two (2) or more Fiscal Years, the Manager will exercise their reasonable discretion to determine (i) the aggregate liquidation proceeds likely to be available for distribution pursuant to subsection 14.4.3, and accordingly, each Member's estimated Targeted Distribution Amount and (ii) the appropriate allocations to be made pursuant to this subsection 5.3.7 taking into account allocations of items of income, gain, deduction and loss likely to be made in subsequent years prior to final liquidation and dissolution of the Company. Amended returns will be prepared pursuant to this subsection 5.3.7 to the extent necessary and possible to ensure that the distributions made pursuant to subsection 14.4.3 to each Member equal, as nearly as possible, such Member's Targeted Distribution Amount.

5.4    **Varying Interests of the Members**. Anything contained in this Article 5 to the contrary notwithstanding, the allocation of Profits, Losses and items of income, gain, expense or loss for any Fiscal Year of the Company during which a Person acquires a Percentage Interest will take into account the Members' varying interests in the Company for such Fiscal Year pursuant to any method permissible under Section 706 of the Code that is selected by the Manager.

5.5    **Tax Allocations: Code Section 704(c)**. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subsection 1.25.1. In the event the Gross Asset Value of any Company Assets is adjusted pursuant to subsection 1.25.2 hereof, subsequent allocations of income, gain, loss and deduction with respect to such Company Assets will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations will be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 5.5 are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

5.6    **Tax Matters Partner**

5.6.1    The Manager is designated the tax matters partner (the "TMP") as defined in Section 6231(a)(7) of the Code, and the Members will take such actions as may be necessary, appropriate, or convenient to effect the designation of the Manager as TMP. The TMP and the other Members will use their best efforts to comply with the responsibilities outlined in this

section and in Sections 6222 through 6232 of the Code (including any Treasury Regulations promulgated thereunder).

     5.6.2   The Members will furnish the TMP with such information as the TMP may reasonably request to permit it to provide the Internal Revenue Service with sufficient information to allow proper notice to the parties in accordance with Section 6223 of the Code.

     5.6.3   These provisions will survive the termination of the Company or the termination of any Member's interest in the Company and will remain binding on the Members for a period of time necessary to resolve with the Internal Revenue Service or the Department of the Treasury any and all matters regarding the Federal income taxation of the Company and each of the Members with respect to Company matters.

     5.6.4   Notwithstanding the foregoing, the TMP will not litigate or enter into any agreement concerning or settle any tax issue that will be binding on FE and IMC without their prior written consent.

     5.7    **Elections**. Company tax elections will be made by the Manager as the Tax Matters Partner, subject to the prior approval of both Members. Unless the Members agree otherwise, elections will be made to maximize tax benefits under the regular income tax without regard to the alternative minimum tax under Section 55 of the Code. Notwithstanding anything contained herein to the contrary, the Members agree that no elections will be made by any Member, including the TMP, that could jeopardize the characterization of distributions pursuant to Section 6.2 as other than long term capital gains without the prior approval of FE and IMC.

### ARTICLE 6
### DISTRIBUTIONS; BOOKS AND RECORDS; AUDITS

     6.1    **Frequency of Distributions**. The Company will distribute any Net Cash From Operations not less frequently than quarterly, and will distribute Net Cash From Sales or Financings as promptly as possible.

     6.2    **Order and Priority of Distributions of Net Cash From Operations and Net Cash from Sales or Financings**. Net Cash From Operations and Net Cash From Sales or Financings will be distributed in the following order and priority:

     6.2.1   First, 95% to IMC and 5% to FE until such time as IMC has been repaid the entire amount of all Initial Capital Contributions made by IMC to the Company, plus its "Preferred Return" or "interest" on all such Initial Capital Contributions. For purposes hereof, "Preferred Return" means an annual return on the amount invested at the rate of ten percent (10%) per annum from the date the Company receives such investment from a Member. The Preferred Return shall be compounded annually and shall be paid quarterly as available out of Net Cash from Operations and Net Cash from Sales or Financings. For purposes hereof, "interest" will be detailed in separate promissory notes with the company and priority of payments and distributions from the Company will be specifically addressed in the secured promissory notes.

6.2.2  Next, if the Members have made Additional Capital Contributions, to the Members pro rata based upon the percentage of the total Additional Capital Contributions contributed by each such Member until the Members have received the return of all Additional Capital Contributions made by each such Member, together with the Preferred Return thereon.

6.2.3  Thereafter, 60% to IMC and 40% to FE.

6.3  **Special Distributions to Pay Taxes**.  In the event that a Member is not in any fiscal year distributed Net Cash from Operations and/or Net Cash from Sales or Refinancings equal to 40% of the "Net Income" (hereinafter defined) allocated to that Member by the Company in that fiscal year, then such Member shall receive a "Special Distribution" (hereinafter defined) in an amount necessary to cause that Member to receive Net Cash from Operations and/or Net Cash from Sales or Refinancings equal to 40% of the Net Income allocated to that Member; provided, however, no more than 65 % of the aggregate Net Cash from Operations and/or Net Cash from the Sales or Refinancings in any fiscal year shall be distributed to the Members pursuant to this Section 6.3 as a Special Distribution. If there is insufficient Net Cash from Sales or Refinancings and/or Net Cash from Operations to distribute to each Member in any fiscal year an amount equal to 40% of the Net Income allocated to each such Member by the Company for that fiscal year, then the Special Distribution shall be in the ratio that is necessary to cause the following percentage for each of the members to be as close to 40% as possible: (a) the amount of distributions from the Company (including Special Distributions and distributions pursuant to Sections 6.2.1, 6.2.2, and 6.2.3) to that Member in the fiscal year divided by (b) the amount of Net Income allocated to the Member in the fiscal year. Net Income shall mean the amount by which the items of income and gain (as determined for Federal income tax purposes) allocated to a Member by the Company. Special Distribution shall mean a distribution made by the Company to one or both Members pursuant to this Section 6.3.

Because the amount of items of income, gain, deduction and loss of the Company, and the manner in which they are allocated to the Members and the amount of distributions by the Company to its Members may not be known until after the close of a fiscal year, the TMP may make reasonable estimates of the amount of Special Distributions to which a Member will be entitled in a fiscal year and may make Special Distributions based on those estimates. To the extent a Member is distributed one or more Special Distributions in excess of the Special Distributions to which such Members would be entitled, based on the actual amounts distributed to and allocated to a Member during the fiscal year (such amount shall be referred to as an "Excess Distribution"), then the Member or Members receiving an Excess Distribution shall return to the Company an amount of cash equal to the Excess Distribution, without interest, within one hundred and twenty (120) days of the Company's fiscal year.

6.4  **Books and Records**.  At the expense of the Company and to be determined and approved by IMC, the Manager will maintain or cause to be maintained, in accordance with generally accepted accounting principles applied in a consistent manner, and more specifically in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, adequate and accurate books and records of account in which will be entered all matters relating to the Company, including all income, expenditures, assets and liabilities. The books and records will be maintained at the Company's principal office or at such other location designated by the Manager. The books and records together with all supporting vouchers and data will be open to examination and copying by any Member or its/his duly constituted representative during normal

-17-

business hours at the Company's principal office. Any Member may at any time request that a firm of independent certified public accountants audit the books and records of the Company, provided that the cost of such audit, if separate from the annual audit described in Section 6.5, will be borne by the Member requesting such audit except that, if the new audit discloses any substantial discrepancy from any regular Company audit, the cost of the audit will be paid by the Company.

6.5    **Audits**.  At the expense of the Company and to be determined and approved by IMC, the Manager will cause the Accountants to perform an annual audit of the Company's books and records. Each Member will be furnished with a copy of the audit report on the financial statements of the Company. The financial statements will be prepared on a generally accepted accounting principles basis and will include a balance sheet, a statement of Capital Accounts of the Members, a statement of operations and a statement of changes in financial position. The audit and financial statements will be completed as soon as reasonably practical after the close of the Company's Fiscal Year.

6.6    **Fiscal Year**. The Fiscal Year of the Company for both reporting and federal income tax purposes will be the Fiscal Year ending on the last day of December.

## ARTICLE 7
## DEVELOPMENT AND MANAGEMENT OF THE PROPERTY

7.1    **Title to Property**.  Unless the Members agree otherwise, title to all real and personal property acquired in accordance with this Agreement will be held in the Company's name. All contracts with third parties will be executed in the name of the Company.

7.2    **Additional Capital Requirements**. FE and IMC will be responsible for obtaining any loans and any other debt or equity financing for the purchase or development of the Property.

7.3    **Management of the Property**.  Day-to-day management of the Property will be performed by BPB, an Affiliate of IMC, and an Affiliate of FE (collectively the "Management Company"), or such other management company as IMC may approve. The management agreement between the Company and the Management Company will be subject to the approval of IMC and will not be subject to change thereafter without the consent of FE and IMC. The management agreement shall contain industry standard provisions for a winery management agreement and shall be terminable only for cause. All Property employees will be selected and supervised by the Management Company and approved by IMC.  The initial management fee shall be $20,000 per month, which shall be split $10,000 to an Affiliate of FE and $10,000 to BPB, an Affiliate of IMC.  The management fee shall be increased to $30,000 per month, to be equally shared by BPB, an Affiliate of IMC, and an Affiliate of FE, in future if the Company cash flow can support such an increase and as reasonably determined and approved by IMC.

7.4    **Quarterly Reports**. The Management Company shall prepare, review and deliver to the Manager detailed reports, which shall include balance sheets, sources and uses of funds statements and other items on the operation of the Property and Company business on a monthly basis.  The Manager shall deliver to the Members on a quarterly basis reasonably detailed reports on the operation of the Property and Company business during the preceding quarter.

## ARTICLE 8
## RIGHTS AND POWERS OF MEMBERS

8.1    **Powers of Members**.  No act will be taken, sum expended, decision made or obligation incurred by the Company or the Manager or any Member with respect to any matter within the scope of the following Major Decisions enumerated below, unless such matter has been approved by IMC, either separately or as a part of the Budget, to-wit:

8.1.1    subject to subsection 9.4.1, removal of the Manager or election of a new Manager;

8.1.2    the amendment of the Articles or this Agreement;

8.1.3    the approval or disapproval of the issuance of additional interests in the Company for sale to then existing Members or new subscribers and the admission of a transferee of some or all of a Member's Interests as a Substitute Member;

8.1.4    the dissolution of the Company;

8.1.5    acquisition of any interest in real property, including the Property, and any decision to market, sell, transfer or assign all or any part of the Company Assets (except as specifically provided to the contrary in this Agreement);

8.1.6    any material modification to any developmental approvals obtained from any Governmental Authorities for development of the Property or any portion thereof;

8.1.7    approving the amount, terms, conditions and provisions of the Construction Loan or any other financing of the Property or additional equity contributions to the Company, including the terms of any guarantees or recourse provisions of any kind with respect to such loans;

8.1.8    the formation of a partnership or other venture between the Company and a third party;

8.1.9    except as described in Section 7.3, entering into any contract between the Company and a third party that is an Affiliate of a Member;

8.1.10   approval of the Budget and any amendments thereto;

8.1.11   any capital expenditures in excess of One Hundred Thousand Dollars ($100,000) per expenditure or in excess of Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate per annum, unless provided for in the Budget;

8.1.12   any decision concerning reconstruction or repair in the event of a casualty in excess of Two Hundred Thousand Dollars ($200,000) or any condemnation;

-19-

8.1.13 any decision to pay a Manager or a Member a salary or other compensation and the amount of such salary or other compensation and other benefits, except as otherwise provided in Section 7.5 or this Article 8; or

8.1.14 entering into leases of space on the Property.

The Members acknowledge, covenant and agree that in making decisions affecting the Property, the Members will act reasonably, recognizing their fiduciary responsibility to all Members. To the extent feasible and financially reasonable, they will not make decisions which favor one Member over the others.

8.2 **Transactions Between a Member or Manager and the Company.** Except as otherwise provided by applicable law or this Agreement, any Member or Manager may, but will not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member or a Manager.

8.3 **Member Activities.** Any of the Members, their Affiliates and any shareholder, officer, director, partner, employee or other Person holding a legal or beneficial interest in an entity which is a Member or an Affiliate thereof, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including but not limited to the ownership, development, construction, operation and management of commercial property similar to the Property provided that no such other venture shall compete with the Property within the Napa County area; and (subject to Section 3.4) neither the Company nor the other Members will have any right, by virtue of this Agreement, to enter into or participate in such independent ventures or to share the income or profits derived therefrom or any other rights therein; and, each of the Members hereby waives whatever statutory or other rights to the contrary which he/she may now or hereafter possess.

8.4 **Affiliates.** The fact that a Member, an Affiliate, or a shareholder or partner of a Member or Affiliate is directly or indirectly interested in, owned, employed or connected with any Person employed by the Company or the Manager, to render or perform a service for the Company or from which the Company or the Manager may buy merchandise, material, services or other property, will not prohibit the Company or the Manager from employing such Person or from purchasing merchandise, material, services or other property therefrom or from otherwise dealing with the Person under reasonable terms and conditions such as would be reflected in an arms-length transaction, provided, all such dealings are communicated to the Members in writing prior to implementation.

8.5 **Reimbursements.** The Company will reimburse the Members and the Manager for reasonable expenses incurred and paid by any of them in the organization of the Company and as authorized by the Company in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such expenses will not include any expenses incurred in connection with a Member's or a Manager's exercise of its rights as a Member or a Manager apart from the authorized conduct of the Company's business. The Manager's sole determination of which expenses are allocated to and reimbursed as a result of the Company's activities or business and the amount of such expenses will be conclusive.

-20-

such reimbursements will be treated as expenses of the Company and will not be deemed to constitute distributions to any Member of profit, loss or capital of the Company. All expenses incurred by BPB, an Affiliate of IMC, and an Affiliate of FE, acting collectively as the Management Company, must be approved by the IMC and outlined in the management agreement between the Management Company and the Company.

8.6 **Partition**. While this Agreement remains in effect or is continued, each Member agrees and waives its rights to have any Company Assets partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Company Assets partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

8.7 **Resignations; Retirement**. A Member may not resign from the Company unless (i) he has contributed the full amount of money or other consideration which constitutes his Capital Contribution as required herein; and (ii) following his resignation there will be at least two (2) remaining Members of the Company. The Company may recover damages for breach of this Section 8.7 if any Member violates this Section 8.7 and may offset the Company's damages against any amount owed to a resigning Member for distributions.

**ARTICLE 9**
**MANAGER**

9.1 **Manager**.

9.1.1 The management of the Company's business will be vested in the Manager. The Manager will have the authority to sign agreements and other instruments on behalf of the Company. Either Manager may sign agreements or other instruments without the joinder of the other Manager, subject to any requirements in this Agreement for prior approval of such agreements or other instruments.

9.1.2 The initial Managers are named in Section 1.28. Each such individual will serve until such time as he resigns, retires, dies or is removed. Upon the resignation, retirement, death or removal of any Manager, FE and IMC will designate the replacement Manager, subject to the approval of IMC.

9.1.3 The Manager may engage in other business activities as permitted by Section 8.3 and will be obliged to devote only as much of his time to the Company's business as may be reasonably required in light of the Company's business and objectives. The Manager will perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties will not have any liability by reason of being or having been a Manager of the Company.

9.1.4 The number of Managers will be two (2), who will be an entity or a natural person eighteen (18) years of age or older but who need not be a Member of the Company or a resident of Nevada .

9.1.5   In performing his duties, the Manager will be entitled to rely on information, opinions, reports or statements of the following persons or groups unless he has knowledge concerning the matter in question that would cause such reliance to be unwarranted:

(a)   one or more employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b)   any attorney, public accountant or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence; or

(c)   a committee upon which he does not serve, duly designated in accordance with a provision of this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

9.1.6   The Manager is an agent of the Company for the purpose of its business, and the act of the Manager, including the execution in the Company name of any instrument for apparently carrying on in the usual way the business of the Company, binds the Company, unless such act is in contravention of the Articles or this Agreement or unless the Manager so acting otherwise lacks the authority to act for the Company and the person with whom he is dealing has knowledge of the fact that he has no such authority.

9.2   **Powers of the Manager**. Subject to the limitations set forth elsewhere in this Agreement, the Manager will have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the day-to-day management and conduct of the Company's business.

Subject to Section 8.1, the Manager may exercise all powers of the Company and do all such lawful acts and things as are not by statute, the Act, the Articles or this Agreement, directed or required to be exercised or done by the Members, except that no debt will be contracted or liability incurred by or on behalf of the Company except as set forth in the Budget. All instruments, contracts, agreements and documents providing for the acquisition, mortgage or disposition of the Company Assets will be valid and binding on the Company if executed by the Manager. All instruments, contracts, agreements and documents of whatsoever type executed on behalf of the Company may be executed in the name of the Company by the Manager.

9.3   **Salaries**.   Subject to subsection 8.1.13, the Company may not pay to any Manager, Member or other person a salary as compensation for their services rendered to the Company, except as specifically set forth in the Budget. Such salaries will be treated as expenses of the Company and will not be deemed to constitute distributions to the recipient of any profit, loss or capital of the Company.

9.4   **Removal of a Manager**.

9.4.1   Subject to the provisions of the Act and subject to the satisfaction of the conditions specified in this Section 9.4, a Manager may be removed with cause. "Cause" for removal of a Manager will be deemed to exist if (a) a Manager (i) breaches this Agreement and fails to cure such breach or institute steps to cure promptly after receiving a written notice of

-22-

breach from any Member describing the breach, or (ii) is permanently disabled or becomes legally incompetent, or (b) an Act of Insolvency occurs as to such Manager. FE and IMC must remove and replace the Manager when "cause" is deemed to exist.

      9.4.2   Any removal of a Manager will become effective on such date as may be specified by FE and IMC, but not later than ten (10) days after "cause" is deemed to exist.

      9.5    **Resignation of a Manager**.  A Manager may resign from his position as a Manager at any time by notice to the Members. Such resignation will become effective as set forth in such notice.

      9.6    **Vacancies**.  Any vacancy occurring in the position of Manager will be filled by the Member who originally appointed the vacating Manager. A Manager chosen to fill a vacancy will serve the unexpired term of his predecessor in office.

      9.7    **Duties of the Manager**. The Manager will have the following primary duties and responsibilities, with such limitations on their powers as set forth below and elsewhere in this Agreement:

      9.7.1   The preparation of the Budget and expending the capital and revenues of the Company in accordance with such approved Budget;

      9.7.2   Negotiating and arranging for all third party equity requirements, any loans, and preparing all projections, financial reports and other information or material to be furnished to lenders;

      9.7.3   Supervising construction, alterations and improvements with respect to the Property; retaining, terminating and/or hiring the services of engineers, surveyors, appraisers, accountants, attorneys, mortgage brokers, corporate fiduciaries, escrow agents, depositories, custodians, agents for collection, insurers, insurance agents, and such other technical or administrative advisors as reasonably deemed necessary by the Manager to further the purposes of the Company; retaining agents and employees for the Company, including property managers for the Property, and to delegate any of its powers (but not their obligations) to such agents or employees and direct such agents or employees with respect to the implementation of the Manager's decisions and the conduct of day-to-day operations of the Company;

      9.7.4   The negotiation, administration, review and coordination of contracts on behalf of the Company relating to the Property, and the administration and coordination of on-site and offsite improvements, warranty claims and corrective work;

      9.7.5   Entering into and executing (i) agreements and any and all documents and instruments customarily employed in the real estate industry in connection with the development and operations of the Property; and (ii) all other instruments deemed to be necessary or appropriate to the proper operation of the Property or to perform effectively and properly their duties or exercise their powers hereunder;

      9.7.6   Placing or investing Company assets in bank savings and checking accounts, savings and loan associations, commercial paper, government securities, certificates of

deposit, bankers' acceptances and other short-term interest-bearing obligations; provided, however, that the Manager will use best efforts to cause uninvested cash reserves of the Company to be placed in interest-bearing accounts or instruments. To the extent funds of the Company are sufficient therefor, the Manager may maintain reserves for operating or other expenses to the extent contemplated in the Budget;

9.7.7   The performance of other customary development functions, including seeking to obtain all local, state and federal permits, approvals and land use consents and acting as a liaison with all Governmental Authorities having jurisdiction over the development of the Property, and processing all governmental permits and approvals; and authorizing such research reports, economic and statistical data, evaluations, analysis, opinions and recommendations as may be necessary to further the purposes of the Company;

9.7.8   Subject to the other provisions of this Article 9, supervising the marketing and sales of all or any portion of the Property and negotiating and executing contracts, or authorizing others to negotiate and execute contracts for sales of all or any portion of the Property;

9.7.9   Procuring and maintaining insurance policies with such coverage and in such amounts as required by this Agreement or any lender;

9.7.10  File protests regarding property tax assessments and commence, defend, and settle litigation arising from such protests;

9.7.11  Prepare and deliver to each of the Members periodic reports not less than quarterly of the state of the business and the affairs of the Company as well as quarterly financial statements, and maintain, or cause to be maintained, the books and records;

9.7.12  Within seventy-five (75) days after the end of each Fiscal Year, or as soon as reasonably practical after the end thereof, cause the Accountants to conduct the audit required herein, and prepare and deliver to each Member a report setting forth in sufficient detail all such information and data with respect to business transactions affected by or involving the Company during such Fiscal Year as will enable the Company and Members to prepare their Federal, state and local income tax returns in accordance with the laws, rules and regulations then prevailing. The Manager will also cause such Accountants to prepare Federal, state or local tax returns required of the Company and file the same. The Manager will also furnish to each Member such other reports on the Company's operations and conditions as may be reasonably requested by any Member;

9.7.13  Collecting all revenues payable to the Company and depositing all sums collected in the Company's account or accounts in a bank or financial institution selected by the Manager; and

9.7.14  Making, or causing to be made, distributions of Net Cash From Operations and Net Cash From Sales and Financings pursuant to Section 6.2.

9.8   **Reimbursement to Members**. Other than as specifically mentioned and agreed to herein, no Member will be paid any compensation or reimbursed any cost in connection with Company matters.

9.9   **Expenses of Company**.  Expenses to carry out the purposes and business of the Company will constitute Company expenditures and, whenever possible, will be paid by the Company from its accounts.

## ARTICLE 10
## MEETINGS AND VOTES OF MEMBERS

10.1   **Meetings**. Meetings of the Members will be held each year at the business office of the Company or at such other place either within or without the State of California as specified from time to time by the Manager. If the Manager specifies another location such change in location will be recorded on the notice calling such meeting.

10.2   **Annual Meetings**.  In the absence of a notice from the Manager providing otherwise, the annual meeting of Members of the Company for the transaction of such business as may properly come before the meeting, will be held on the first Wednesday in August at 4:00 p.m. in each fiscal year, if the same be not a legal holiday, and if a legal holiday, then on the next succeeding business day. Failure to hold the annual meeting at the designated time will not work a forfeiture or dissolution of the Company.

10.3   **Special Meetings**. Special meetings of the Members will be scheduled and presided over by the Manager. Special meetings may be called by the Manager or upon the request of Members who hold not less than ten percent (10%) of the voting rights entitled to vote the meeting provided that requests to approve the admission of Substitute Members may be postponed until the annual meeting of the Members.

10.4   **Court Ordered Meeting**.

10.4.1 Any court of competent jurisdiction in the State of California may summarily order a meeting to be held:

(a)    on application of any Member if an annual meeting was not held within six (6) months after the end of the Company's fiscal year or fifteen (15) months after its last annual meeting, whichever is earlier; or

(b)    on application of a Member who participated in a proper call for a special meeting if (i) notice of the special meeting was not given within thirty (30) days after the date the demand was delivered to the Manager; or (ii) the special meeting was not held in accordance with the notice.

-25-

10.4.2  The court may fix the time and place of the meeting, specify a record date for determining Members entitled to notice of and to vote at the meeting, prescribe the form and content of the meeting notice, fix the quorum required for the meeting or direct that the interests represented at the meeting constitute a quorum for the meeting, and enter other orders necessary to permit the meeting to be held.

10.5  **Notice**.

10.5.1  Written notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, will be delivered unless otherwise prescribed by the Act, not less than five (5) days nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or person calling the meeting to each Member of record entitled to vote at such meeting.

10.5.2  Notice to Members of record, if mailed, will be deemed delivered as to any Member when deposited in the United States mail, addressed to the Member with postage prepaid, but, if three (3) successive letters mailed to the last-known address of any Member are returned as undeliverable, no further notices to such Member will be necessary until another address for such Member is made known to the Company.

10.5.3  When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Company may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting will be given to each Member entitled to vote at the meeting.

10.6  **Waiver of Notice**.

10.6.1  When any notice is required to be given to any Member under the provisions of the Act or under the provisions of the Articles or this Agreement, a waiver thereof in writing signed by the person entitled to such notice, whether before, at or after the time stated herein, will be equivalent to the giving of such notice.

10.6.2  By attending a meeting, a Member:

(a)    waives objection to lack of notice or defective notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transacting of business at the meeting;

(b)    waives objection to consideration at such meeting of a particular matter not within the purpose or purposes described in the meeting notice unless the Member objects to considering the matter when it is presented.

10.7  **Proxies**.  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy will be

-26-

filed with the Manager before or at the time of the meeting. No proxy will be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

10.8   **Voting by Members**. An affirmative vote by or on behalf of all of the Members will be required to approve or disapprove any matter on which the Members are entitled to decide, except as otherwise provided in this Agreement or in the Act.

10.9   **Voting Procedures**.

10.9.1  The costs of calling and holding the annual meeting of the Members and special meetings called by the Manager will be paid by the Company. Such costs for all other meetings called by the Members will be paid by the Members calling the meeting. Each Member will be responsible for its own costs associated with attending and participating in a meeting.

10.9.2  Matters not described in a meeting notice maybe discussed at a meeting if all Members or their authorized representatives are present at the meeting and may be voted upon if the Members or their authorized representatives possessing at least the required percentage of the votes to approve such matter are present at the meeting.

10.10  **Action by Members Without a Meeting**. Unless the Articles, the Act or this Agreement provide otherwise, action required or permitted by the Act to be taken at a Members' meeting, including but not limited to the annual meeting, may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote. Action taken under this Section 10.10 is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

Written consent of all of the Members entitled to vote on any matter has the same force and effect as a unanimous vote of such Members and may be stated as such in any document.

## ARTICLE 11
## MEMBERS' LIABILITY AND INDEMNITY

11.1   **Members**.

11.1.1  No Member will be liable under a judgment, decree or order of a court, or in any other manner, for the debts, liabilities or obligations of the Company. A Member will have no liability to any other Member and/or the Company when acting pursuant to its authority granted pursuant to the Articles and/or this Agreement except to the extent such Member's acts or omissions constituted willful misconduct or gross negligence of such Member. Additionally, a Member will be liable to the Company for any difference between its Capital Contribution actually paid in and the amount promised by any Member as stated in this Agreement or any writing signed by the Member.

11.1.2  If a Member has received the return of any part of its Capital Contribution in violation of this Agreement or the Act, it is liable to the Company for a period of six (6) years thereafter for the amount of the Capital Contribution wrongfully returned.

11.1.3 If a Member has received the return in whole or in part of its Capital Contribution without violation of this Agreement or the Act, that Member is liable to the Company for a period of six (6) years thereafter for the amount of the returned Capital Contribution, but only to the extent necessary to discharge the liabilities of the Company to those creditors who extended credit to the Company during the period the Capital Contribution was held by the Company.

Any liability of a Member to the Company under this Article 11 can be waived or compromised pursuant to approval of all of the other Members. A Member who is subject to an obligation to repay any Capital Contribution to the Company as required by the Articles or this Agreement must make such repayment on demand by the Company. No Member will be liable to the Company, its creditors or any other Member with respect to any amounts paid to such Member as profit sharing, loan repayment, interest, salary, wage, rental, royalty, fee or payment for value given which is not paid to such Member as a return of such Member's Capital Contribution.

11.2    **Manager**. The Manager does not in any way guarantee the return of any Members' Capital Contribution or a profit for the Members from the Company's business. The Manager will incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture regardless of whether such other business or venture competes with the Company or whether the Manager is active in the management or business of such other business or venture, provided that the Manager's involvement in such other business or venture is permitted under this Agreement. Neither the Company nor any of the Members will have any rights by virtue of the Articles, this Agreement or any applicable law in or to the other business ventures of the Manager or to the income, gains, losses, deductions and credits derived therefrom by the Manager.

11.3    **Company's Indemnification of Members, Manager, Employees or Agents**. The Company agrees to indemnify its Members, Manager, employees and agents to the fullest extent permitted by law and specifically in the Act, and may purchase insurance to protect the Company's directors, officers, employees and agents.

11.4    **Force Majeure**. Notwithstanding anything in this Agreement to the contrary, a Member or the Manager will not be liable (except for such Member's obligation to contribute or return its Capital Contributions under the Act or this Agreement) for any loss or damage to the Company Assets or operations caused by its failure to carry out any of the provisions of the Articles and/or this Agreement as a result of foreseeable or unforeseeable acts of God or incidents resulting from outside forces, beyond the control of such Member or Manager, such as strikes, labor troubles, riots, fires, weather, floods, acts of a public enemy, insurrections, breakdown or failure of machinery, acts, omissions or delays of governmental authorities and governmental laws, rules, regulations or orders.

11.5    **Remedies**. The remedies of the Members hereunder are cumulative and will not exclude any other remedies to which a Member may be lawfully entitled. The Members acknowledge that all legal remedies for any breach of this Agreement may be inadequate, and therefore they consent to any appropriate equitable remedy; provided, that any failure of a Member to abide by the terms of this Agreement, including without limitation any vote or consent that should bind a Member, or any other failure to adhere to the terms of this Agreement

-28-

which cost the Company legal and court costs to enforce same will render the breaching Member liable to the Company for any such fees and costs.

   11.6   **Waiver**. The failure of any Member to insist upon strict performance of a covenant or condition hereunder will not be a waiver of its right to demand strict compliance therewith in the future.

**ARTICLE 12**
**ADDITIONAL MEMBERS AND INTERESTS**

   12.1   **Additional Interests**. By approval of or on behalf of the Members possessing sixty percent (60%) of the Interests, the Company may issue Additional Interests by sale or other issuance to existing Members or other persons or entities (separately and together, the "Additional Members"). Any such sale or other issuance of Interests will be made in accordance with the Articles and this Agreement. As a condition to such issuance, the Additional Members acquiring such Interests will execute (a) an instrument by which the Additional Members acknowledge the terms and conditions of and covenants and agrees to be bound by the Articles and this Agreement and (b) all other documents and instruments the Company may require. The Additional Members will become Members as regards such Interests upon the date the last of such agreements or instruments are executed. The legal fees and costs associated with the preparation and filing of an amendment to the Articles to effectuate such admission, if necessary, and all other documents necessary to continue the Company's right to do business in the jurisdictions in which it is then doing business, will be borne by the Company.

   12.2   **Allocations**. The Additional Members will not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits or other matters of any kind; provided that the Additional Members will be entitled to their respective share of the Company's income, gains, losses, deductions, credits and other matters of any kind arising under contracts entered into before the effective date of the issuance of any Interests to the extent that such income, gains, losses, deductions, credits and other matters of any kind arise after such effective date. The Company's books may be closed at the time Interests are issued (as though the Company's tax year had ended) or the Company may credit to the Additional Interests pro rata allocations of the Company's income, gains, losses, deductions, credits and other matters of any kind for that portion of the Company's fiscal year after the effective date of the issuance of the Interests.

**ARTICLE 13**
**TRANSFERS**

   13.1   **Transfer Restrictions**. Each Member hereby agrees that its Interests and any economic benefit therein are not transferable except as provided in this Article 13. "Economic benefit" or "benefit" of an Interest will mean an Interest share of the Company's profits or other compensation by way of income and return of contributions but will not include the Company's losses, deductions and credits.

-29-

13.2    **Prohibited Transfer**. Except as provided in this Article 13, no Member may sell, transfer, assign or otherwise dispose of or mortgage, hypothecate, or otherwise encumber or permit or suffer any encumbrance of all or any part of its Interests unless approved by Members holding at least 90% of the Interests in the Company in writing in their sole and absolute discretion, and any attempt to so transfer or encumber any such interest will be null and void and will not bind the Company or the other Members.

13.3    **Right of First Offer and "Tag Along" Rights**. Subject to Section 13.11 below, If a Member (the "Selling Member") desires to sell or transfer all of its Interests, such Member must first give notice in writing to the other Members (the "First Offer Notice"), which notice must contain a statement setting forth the price and other terms and conditions which the Selling Member is willing to accept for its Interests. For a period of thirty (30) days following the giving of the First Offer Notice, the Members receiving such notice will have the right (i) to purchase the Interest proposed to be sold on the same terms and conditions as the offer set forth in such notice or (ii) to sell its Interests together with Interest of the Selling Member. A Member who desires to purchase or to sell in accordance with the preceding sentence must give notice in writing of such desire to the Selling Member within thirty (30) days after the date of giving the First Offer Notice by the Selling Member, and (if electing to purchase) shall consummate such purchase in accordance with the terms of the First Offer Notice. If the Member receiving the First Offer Notice elects to sell its Interests together with those of the Selling Member, then the Selling Member must include the Interests of the other Member in any offering and sale of its Interests. If the Member receiving the First Offer Notice does not give notice within such 30 day period of its desire to purchase such Interest or of its desire to sell its Interests together with those of the Selling Member, the Selling Member may sell its Interests any time during the six (6) months following such thirty (30) day period, pursuant to terms and conditions not more favorable to the purchaser than those set forth in the First Offer Notice, provided that, if such sale is not consummated within such six (6) month period, then such Interests will again become subject to the transfer restrictions of this Agreement.

13.4    **Requirements for Transfer**. Transfers of Interests and/or economic benefits therein during any year will become effective as of the date of any required approval by the requisite percentage of the Members, provided that the transferee and transferor have satisfied all of the requirements of this Article 13. Subject to satisfying the requirements of this Article 13, any such transfer requiring approval of the Members pursuant to this Article 13 will be considered by the Members at the Members' next annual or special meeting. Unless and until the transferee of a Member's Interests is accepted by a Substitute Member pursuant to this Article 13, the transferor Member will remain a Member in the Company and will retain all rights and obligations incident to such status, except to the extent that the transferor agrees to transfer the economic benefits of its Interests as permitted by this Article 13 for transfers of economic benefits without the consent of the other Members.

Notwithstanding anything to the contrary, any attempted or purported transfer of any Interest or economic benefit therein (including, but not limited to, an adjustment of the right to receive profits or the return of contributions) in violation of the following restrictions will be void ab initio and of no effect:

13.4.1  No transfer may be made within the meaning of the Code or the regulations thereunder, if the Interests or economic benefits sought to be transferred, when added

to all other Interests and economic benefits transferred within the period of twelve (12) consecutive months prior thereto, equals fifty percent (50%) or more of the total interest in Company profits and capital, or otherwise would result in the termination of the Company under the Code;

        13.4.2  No transfer may be made except in compliance with or pursuant to an exemption from the registration provisions of the Securities Act of 1933, as amended, and in compliance with or pursuant to an exemption from applicable state securities laws and rules and regulations promulgated thereunder;

        13.4.3  No transfer may be made which would cause the Company to become an "investment company" under the Investment Company Act of 1940, as amended;

        13.4.4  No transfer may be made which would cause the Company to be deemed to be a "publicly traded partnership" under the Code or would otherwise cause the Company to be treated as an association or corporation for tax purposes under the Code; and

        13.4.5  No direct transfer may be made to a minor or incompetent in any respect unless made for their benefit to their guardian, trustee or other legal representative.

    13.5    **Company Review**. Prior to the vote of the Members for their approval of the admission of a transferee of Interests as a Substitute Member the transferor may submit a written or oral report of the proposed transfer to the Company for its review. Subject to obtaining an opinion of counsel that the restrictions provided in this Article 13 will not be violated by the transfer, the Company will notify the transferor within sixty (60) days after receipt whether or not the proposed transfer violates any of the restrictions contained in this Article 13 and whether or not the transfer consequently may be effected. Any opinion of counsel will be provided at the option of the Company by the transferring parties at their sole expense, will be satisfactory in form and substance to the Company and will be from counsel satisfactory to the Company.

    13.6    **Transfers of Economic Benefits Without Members' Approval**.  Subject to Sections 13.1 and 13.2, economic benefits in Interests may be transferred in whole or in part without the consent of the Members in the following events:

        13.6.1  the transfer as a result of the death of a Member;

        13.6.2  the transfer in connection with the entry of a divorce decree for or against a Member;

        13.6.3  the transfer as a gift and for no consideration;

        13.6.4  the transfer to related parties after which the ownership of the economic benefits will be effectively unchanged, i.e., intra-family transfers or transfers within an affiliated group;

        13.6.5  the occasional accommodation transfer by a Member; or

        13.6.6  the pledge to a lender in connection with any financing of the Property.

13.7    Transfers with Members' Approval.

13.7.1 Following satisfaction of the requirements of Sections 13.4 and 13.5, a proposed transfer of Interests requiring the Members' approval will be submitted to the Members for their approval after:

(a)    the transferee has executed this Agreement and any other documents and instruments as the Company may require; and

(b)    the transferring parties have paid and have agreed to pay, as the Company will determine, all reasonable expenses connected with such request and admission, including, but not limited to, any required opinion of counsel, the legal fees and costs associated with the preparation and filing of all other documents necessary to continue the Company's right to do business in the jurisdictions in which it is then doing business. The Company will not be obligated to justify such expenses and for its convenience in lieu of itemizing such expenses, may select a reasonable amount to cover such expenses.

13.7.2 Upon satisfaction of Sections 13.4, 13.5 and for Interests, 13.7.1, the request for transfer of Interests will be submitted to the Members at the Company's next annual or special meeting. The Members will vote whether or not to approve a proposed transfer of Interests and whether or not a proposed transferee of Interests should be admitted as a Substitute Member for the transferor Member to the extent of the Interests proposed to be transferred. If a proposed transferee of Interests is not approved to be a Substitute Member, then subject to the provisions of the proposed transfer, such transferee may nevertheless receive the "economic benefits" of such Interests pursuant to the definition of "economic benefits" set forth in Section 13.1 hereof.

13.7.3 If a proposed transfer of Interests is approved by the requisite percentage of the Members, the transferee will be admitted as a Member and will be vested with all the rights and powers, and be subject to all the restrictions and liabilities of the transferor to the extent of the Interests transferred. Admission of a transferee as a Substitute Member will not relieve the transferor from any obligation or liability that existed on or before the effective date of admission; provided that the transferor will be relieved from obligations and liabilities arising thereafter and arising under existing agreements to the extent that such obligations are to be performed after the effective date of admission or that such liabilities arise thereafter.

13.7.4 If a proposed transfer of Interests is refused by or on behalf of any Member, the proposed transferee of the Member's Interests will not be admitted as a Member and will not have the right to participate in the management of the business and affairs of the Company, provided that such transferring parties may again apply to have the transferee admitted as a Substitute Member.

13.8    Death of Member; Other Termination of Membership.

13.8.1 In the event of the death of a Member who is an individual or if a court of competent jurisdiction adjudges a Member to be incompetent to manage his person or his property, followed by a decision by or on behalf of all of the remaining Members to continue the

Company rather than allowing it to dissolve, the Members' executor, administrator, guardian, conservator or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property. If a Member is a corporation, trust or other entity and is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

13.8.2  In the event of bankruptcy or dissolution of a Member, followed by the continuation of the Company rather than a vote of the Members to dissolve the Company, any successor to the Interests of the affected Member as a result thereof will be deemed to be the transferee of the entire interest of the affected Member and may be admitted at the next annual meeting as a Substitute Member upon satisfaction of the requirements of this Article 13.

13.8.3  The provisions of Article 2 and this Section 13.8 will not cause or require the dissolution of the Company should any of the events described in such Article or Section occur to a person or entity who is not a Member but only possesses economic benefits associated with any Interests.

13.9   **Successors and Assigns**.  This Agreement will be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the parties hereto.

13.10  **Pledges of Interests to Lenders in Connection with Financing**. Notwithstanding anything in this Article 13 to the contrary, any Member may, without the consent of the other Members or the Manager, pledge its Interests to any lender in connection with any financing of the Property, provided that in the event of any foreclosure or transfer in lieu of foreclosure or other realization by such lender on such Interests as security, such lender agrees to be bound by the terms and provisions of this Agreement and to perform the obligations of such Member hereunder arising from and after the date of such realization.

## ARTICLE 14
## TERMINATION AND DISSOLUTION

14.1   **Events Requiring Termination and Dissolution**. The Company will be dissolved and terminated upon the happening of any of the following events:

14.1.1  Expiration of the term of the Company, as set forth in Section 2.3, unless extended by mutual consent all of the Members;

14.1.2  Any event as otherwise specified in this Agreement or in accordance with law;

14.1.3  By the written consent of all the Members; or

14.1.4  The sale or other disposition of substantially all assets of the Company such that the sole asset of the Company is cash.

14.2    **Management During Liquidation**. In the event of a termination, the rights and obligations of the Members with respect to management of the Company will be continued by the IMC during the period of winding up. The Company Assets will be liquidated as promptly as is consistent with obtaining the fair market value of the assets, and the liquidation will be conducted in compliance with law and sound business practice. The Manager may maintain reasonable reserves to provide for the payment of contingent claims and liabilities. The Manager will be entitled to reimbursement for out-of-pocket expenses incurred in connection with the winding-up and liquidation of the Company. Such reimbursement will be paid as an expense of the Company after all debts to all third parties have been repaid but before any repayment of loans or advances by the Members.

14.3    **Members' Right to Bid for Assets**. Upon the dissolution and liquidation of the Company, any Member may make a bid or tender on any of the Company Assets. Those assets as are bid upon by a Member will not be sold to a third party unless the bid made by such third party is upon more favorable terms and conditions than the highest and best bid of a Member.

14.4    **Distribution of Liquidation Proceeds**. Liquidation proceeds, to the extent sufficient therefor, will be applied and distributed in the following order:

14.4.1  To the expenses of such liquidation;

14.4.2  To the payment and discharge of all other Company debts and liabilities, including the establishment of any necessary reserves;

14.4.3  All remaining assets of the Company will be distributed to the Members in the manner set forth in Section 6.2 hereof.

14.5    **Distribution of Company Assets**. The Company shall not distribute any Company Assets to its Members upon the liquidation of the Company other than cash unless IMC agrees to the distribution by the Company of assets other than cash and the value to be assigned to such assets. To the extent assets other than cash are distributed to the Members, such distributions shall be based on the fair market value of the assets distributed.

**ARTICLE 15**
**DISPUTE RESOLUTION**

15.1    **Application of Section**. Whenever either the Manager or the Members cannot mutually agree on the resolution of a matter or dispute, the provisions of this Article will apply. The rights and obligations of the Manager with respect to the management of the Company will continue until the dispute is resolved pursuant to this Article 15.

15.2    **Mediation**. In the event of a dispute, any dissatisfied Member will provide notice of the dispute to all of the other Members. The Members will then arrange a meeting to discuss the dispute within ten (10) days of receipt of notice of the dispute. If the dispute cannot be resolved among the Members within thirty (30) days of the meeting to discuss the dispute, then any Member may submit the dispute to mediation by notice to all of the other Members (the "Mediation Notice"). The Member sending such notice shall then have ten (10) days to make a request to a reputable and nationally recognized agency in the State of California which

-34-

specializes in mediation to select a mediator to assist in resolving the dispute. The costs of the mediator will be shared equally by the Members and all decisions as to date, time and location of mediation meetings shall be made by the mediator. If the dispute cannot be resolved through mediation within ninety (90) days of the Mediation Notice, then, and only then, will the provisions of Section 15.3 apply.

15.3    **Other Remedies**.  If the dispute cannot be resolved pursuant to Section 15.2, then either party may seek whatever remedies are available at law or in equity, subject to any limitations set forth in this Agreement, in state or Federal court situated in Napa County, California.

## ARTICLE 16
## AMENDMENTS

16.1    **Proposal of Amendments**.  Any amendments to the Articles and this Agreement must be approved by all the Members.

16.2    **Amendments by TMP**.  Notwithstanding any provision of this Agreement, amendments to this Agreement which, in the opinion of counsel to the Company, are necessary to maintain the status of the Company as a tax partnership under federal or state law or for other tax purposes may be made by the TMP without the necessity of the approval of the Members.

## ARTICLE 17
## MISCELLANEOUS

17.1    **Notice**. All notices, requests, consents and other communications required or permitted under this Agreement must be in writing and must be (as elected by the Person giving such notice) hand delivered by messenger or courier service, telecommunicated, or mailed by registered or certified mail (postage prepaid), return receipt requested, addressed to:

| | |
|---|---|
| If to IMC: | IMC Investment Group FE Winery, LLC<br>880 Northwood Blvd,<br>Incline Village, NV 89451<br>Phone: 775-800-8888<br>Attn:  Mr. Brandon Chaney |
| If to FE: | Fairwinds Estate, LLC<br>c/o Criswell Radovan, L.L.C.<br>1336-D Oak Street<br>St. Helena, California 94574<br>Attn: Robert Radovan<br>Facsimile: 707-963-0513 |

-35-

with copy to:       Powell Coleman & Arnold LLP
8080 North Central Expressway, Suite 1380
Dallas, Texas 75206
Attn: Bruce Coleman, Esq.
Facsimile: 214-373-8768

17.1.1 Each such notice will be deemed delivered (a) on the date delivered if by personal delivery, (b) on the date of a receipt of a clear copy if by telecopy, (c) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the carrier as not deliverable, as the case may be, if sent by overnight courier service such as Federal Express, and (d) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

17.1.2 By giving to the other parties at least fifteen (15) days written notice thereof, the parties hereto and their respective successors and assigns will have the right at any time during the term of this Agreement to change their respective addresses and each will have the right to specify as its address any other address within the United States of America.

17.1.3 A transferee of an interest by any Member will be entitled to receive copies of notices hereunder, provided such transferee will have given notice to the Company and all Members of its designated address for purposes of this Section and further provided that such transferee has otherwise complied with the terms and conditions of this Agreement in acquiring its interest hereunder.

17.2 **Governing Law**. This Agreement has been executed and delivered within the State of California, is a contract made under the laws of the State of California, and will be governed by and interpreted in accordance with the laws of the State of California, without regard to conflict of law principles thereunder.

17.3 **Successors**. Except as otherwise specifically provided herein, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.

17.4 **Pronouns**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender will include the masculine, feminine and neuter.

17.5 **Captions**. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

17.6 **Severability**. If any provision of this Agreement, or the application of such provision to any Person or circumstance, is held invalid, the remainder of the Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, will not be affected hereby.

17.7     **Counterparts**. This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument. In addition, this Agreement may contain more than one counterpart of the signature page, and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages, all of which will have the same force and effect as though all of the signatories had signed a single signature page.

17.8     **Entire Agreement; Amendment**. This Agreement embodies and constitutes the entire understandings of the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Agreement unless specifically agreed to by the Members. Except as set forth in Article 16, neither this Agreement nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing executed by all of the parties hereto.

17.9     **Attorneys' Fees**. If any Member or Manager commences an action against the other Members and/or Manager to interpret or enforce any of the terms of this Agreement or as the result of a breach by the other Member(s) or Manager(s) of any terms hereof, the losing (or defaulting) Member(s) or Manager(s) will pay to the prevailing Member(s) or Manager(s) reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action (including at the appellate level), whether or not the action is prosecuted to a final judgment.

17.10     **Further Assurances**. Each Member agrees to execute and deliver any and all such other and additional instruments and documents and do any and all such other acts and things as may be necessary or expedient to more fully effectuate this Agreement and to carry on the business contemplated hereunder.

17.11     **Equitable Remedies**. Each of the parties hereto acknowledges and agrees that, in the event of a breach or threatened breach of this Agreement by any Member or the failure of a Member to perform in accordance with the specific terms hereof, the other parties hereto will be irreparably damaged and that monetary damages would not provide an adequate remedy. Accordingly, it is agreed that, in addition to any and all other rights which may be available, at law or in equity, the non-breaching parties will be entitled to injunctive relief and/or specifically to enforce the terms and provisions hereof in any action instituted in accordance with Section 17.12.

17.12     **Indemnities**.

17.12.1 The Manager will not be liable for errors in judgment, whether or not disclosed, unless due to gross negligence, willful neglect or intentional misconduct. From and after the Effective Date, the Company will and does hereby indemnify and hold harmless the Manager from and against any and all claims, actions, suits, liabilities, judgments, obligations, losses, penalties, demands, expenses and damages (and all expenses associated therewith, including court costs and attorney's fees at all negotiations, trial and appellate levels) incurred by the Manager in respect of any act or omission to act by the Manager, whether or not such act or omission to act was negligent, including without limitation any such act or omission by them when acting in the good faith belief that they were acting or refraining from acting within the

-37-

scope of their authority under this Agreement on behalf of the Company or in furtherance of their interests provided that the foregoing will not entitle the Manager to indemnification for gross negligence, willful neglect or intentional misconduct.

17.12.2 Notwithstanding subsection 17.12.1, a Member will not be liable to the Company or any other Member arising from any act or omission to act, even if involving gross negligence, willful neglect or intentional misconduct, unless claim, action, right of action, suit, investigation, liability, judgment, obligation, loss, penalty, demand, expense or damage therefor is made or otherwise instituted before such Member ceases to be a Member of the Company or before the date of dissolution, winding up and termination of the Company.

17.13   **Contributions**.  In the event that one Member is held severally liable for the debts of the Company, and such liability did not arise out of such Member's assumption of such liability or its negligent or willful act, such Member will be entitled to contribution from the other Members.

17.14   **No Third Party Rights**.  The provisions of this Agreement are for the exclusive benefit of the Company and the Members and no other party (including without limitation any creditor of the Company or any Member) will have any right or claim against the Company or any Member by reason of those provisions or be entitled to enforce any of those provisions against the Company or any Member.

17.15   **Reliance on Experts**.  For purposes of this Agreement, whenever one of the Members reasonably requires or retains the use of an expert in order to discharge a duty hereunder, such Member's sole responsibility in connection with such duties will be the reasonable reliance upon the advice of the experts, and no Member will be liable on account of any duty or obligation imposed hereunder in the event of a reliance upon professional advice.

17.16   **Submission to Jurisdiction**.  Subject to the provisions of Article 15 hereof, each of the Members irrevocably and unconditionally (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Agreement will be brought in the courts of record of the State of California in Napa County or the courts of the United States with jurisdiction over Napa County, California; (b) consents to the jurisdiction of each such court in any such suit, action or proceeding; (c) waives any objection which he/she may have to the laying of venue of any such suit, action or proceeding in any of such courts; (d) consents to service of any court paper by mail, as provided in Section 17.1 hereof, or in such other manner as may be provided under applicable laws or court rules in California. Notwithstanding the provisions of this Section 17.16, the Members acknowledge that before a Member may file legal action against one or more Members, such Member must have complied with the remedies available pursuant to Article 15 of this Agreement.

17.17   **Remedies Cumulative**. The rights and remedies given in this Agreement to a non-defaulting Member or the Company are deemed cumulative, and the exercise of one of such remedies will not operate to bar the exercise of any other rights and remedies reserved to a non-defaulting Member under the provisions of this Agreement or given to a non-defaulting Member by law.

17.18  **No Waiver**. One or more waivers of a breach of any provision of this Agreement by any Member will not be construed as a waiver of a subsequent breach of the same or any other provision, nor will any delay or omission by a non-defaulting Member to seek a remedy for any breach of any provision of this Agreement by a Member be construed as a waiver by the non-defaulting Member of the right to exercise its/his/her remedies and rights with respect to such breach or any subsequent breach, whether similar or not.

17.19  **Confidentiality**.   Except as required in the normal conduct of a Member's business or as required by law, no Member, without the written approval of all Members, whether during continuance of the Company or after its termination, will divulge to any Person not a Member other than its/his/her attorneys, accountants, employees and professional advisers, any information concerning the business of the Company or the content of this Agreement or any other contract or agreement entered into by the Company. A Member may, however, disclose to third parties the existence of the Company and the names of the Members.

17.20  **Construction**.   This Agreement will be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted.

17.21  **Accounts**. In no case will funds of the Company be commingled with funds not belonging to the Company. Withdrawals from any such account or accounts will be made upon the signature or signatures of such Persons as the Manager may designate.  Wire transfers and/or checks in the amount more than $10,000 must have approval and signatures of both Managers.

17.22  **Time of the Essence**. Time is of the essence of this Agreement.

17.23  **Time Devoted to Venture**. No Member will be required to devote its/his/her entire time or attention to the business of the Venture, or more time or attention than reasonably required to carry out its/his/her obligations under this Agreement.

17.24  **Exhibits**.   All Exhibits, and documents attached thereto, referred to in this Agreement are deemed incorporated herein by reference as if fully set forth in length.

*[Remainder of this page intentionally left blank; signature page and schedules follows.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective as of the date first set forth above.

IMC INVESTMENT GROUP FE WINERY, LLC
a Nevada limited liability company

By: _____
Name: Brandon Chaney
Title: Manager

FAIRWINDS ESTATE, LLC,
a Nevada limited liability company

By: _____
Name: Robert Radovan
Title: Manager

Schedule 4.1

MEMBERS AND INTERESTS

As of March 31, 2015

| Members | Business, Residence or Mailing Address | Percentage Owned |
|---|---|---|
| IMC Investment Group FE Winery, LLC | 880 Northwood Blvd, Ste. 2 Incline Village, NV 89451 | 60% |
| Fairwinds Estate, LLC | 1336-D Oak Street St. Helena, California 94574 | 40% |

Schedule 4.2

INITIAL CAPITAL CONTRIBUTIONS

Equity as of March 31, 2015

| Members | Amount $ |
|---|---|
| Fairwinds Estate, LLC | $0.00 |
| IMC Investment Group<br>FE Winery, LLC | $0.00 |